

**IT IS SO ORDERED.**
**Signed October 14, 2010**

*Arthur S. Weissbrodt*
**Arthur S. Weissbrodt**
**U.S. Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re | Case No. 03-54723 ASW |
| EDWARD L. SCARFF, | Chapter 11 |
| Debtor. | |

**MEMORANDUM DECISION ON CROSS-MOTIONS FOR SUMMARY JUDGMENT ON DEBTOR'S OBJECTION TO PROOF OF CLAIM BY QUESTOR GENERAL PARTNER, L.P.**

Before the Court are cross-motions for summary judgment by debtor Edward Scarff ("Debtor") and creditor Questor General Partner, L.P. ("QGP"), relating to the proof of claim filed by QGP in Debtor's Chapter 11 bankruptcy case ("QGP's Claim").

Debtor is represented by Jeffrey S. Facter, Esq. and Sean T. Strauss, Esq. of Shearman & Sterling LLP, and Gayle Green, Esq. of Binder & Malter, LLP. QGP is represented by Harry Hochman, Esq. and Joshua Fried, Esq. of Pachulski, Stang, Ziehl & Jones LLP, and Sheldon Toll, Esq. of the Law Office of Sheldon S. Toll.

This Memorandum Decision constitutes the Court's findings of fact and conclusions of law, pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rule").

FACTUAL BACKGROUND

The parties agree on most of the underlying facts relating to QGP's Claim.

A. Questor Partners Fund and Its Investors

QGP was the general partner of a limited partnership, private equity fund named Questor Partners Fund (the "Fund").[1] The Fund was formed in late 1994 and invested in underperforming and troubled companies.[2] The Fund had four "principals" as identified in the private offering memorandum and agreement establishing the Fund -- Debtor, Jay Alix, Melvyn Klein, and Dan Lufkin.[3] Prior to their involvement with the Fund, Mr. Lufkin and Debtor had worked together at Donaldson, Lufkin & Jenrette, a private equity funding group.[4]

Along with the backgrounds of the other three principals, Debtor's background as an executive and investor was described to potential investors in the Confidential Offering Memorandum for the Fund (the "Offering Memorandum"), a copy of which is attached as Exhibit 1 to the Declaration of Robert E. Shields in Support of

---

[1] Declaration of Sean T. Strauss In Support of Motion of Debtor-in-Possession Edward L. Scarff for Summary Judgment on Questor General Partner, L.P.'s Amended Proof of Claim ("Strauss Dec."), Exhibits C and E.

[2] Strauss Dec., Exhibit E; Declaration of Robert E. Shields in Support of Questor General Partner, L.P.'s Opposition to Debtor's Motion for Summary Judgment ("Shields Dec."), Exhibit 1.

[3] Shields Dec., Exhibit 1.

[4] Declaration of Harry D. Hochman in Support of Opposition of Questor General Partner, L.P. to Debtor's Motion for Summary Judgment ("Hochman Dec."), Exhibit 1 at 20.

Questor General Partner, L.P.'s Opposition to Debtor's Motion for
Summary Judgment (the "Shields Dec.").[5]  The Offering Memorandum
also describes Debtor's background in private equity acquisitions
of turnaround companies.[6]  The partnership agreement for the Fund
(the "Fund Agreement") states:

> The Principals are experienced investors and fiduciaries,
> and the Principals understand their fiduciary obligations
> to the Partnership and have agreed to act accordingly.

Declaration of Sean T. Strauss In Support of Motion of Debtor-in-
Possession Edward L. Scarff for Summary Judgment on Questor General
Partner, L.P.'s Amended Proof of Claim ("Strauss Dec."), Exhibit E
at 44.



Debtor was actively involved with the Fund and the Fund's
subsidiaries.  Debtor holds a 13.389% interest in QGP -- 13.223%

---

[5]  Shields Dec., Exhibit 1 at 16-21.

[6]  Id.

Case: 03-54723    Doc# 796    Filed: 10/14/10    Entered: 10/14/10 13:21:32    Page 3 of
42

through Pentoga Partners, L.P. ("Pentoga Partners") and 0.167%
through Debtor's interest as a shareholder of Questor Principals,
Inc. ("QPI").[7]  Debtor was a shareholder and active director of
both Questor Management Company, a Delaware corporation ("QMC") and
QPI.  QMC is the manager of QGP, and QPI is the general partner of
QGP.[8]  The minutes from the board meetings of these entities prior
to September 17, 1998, demonstrate that Debtor attended all or
substantially all of the meetings.[9]  Debtor also had individual
responsibility for certain portfolio companies held by the Fund,
and Debtor frequently sat on the boards of such companies.[10]

The Fund and QGP are limited partnerships formed under, and
governed by, the laws of the state of Delaware.[11]  QMC and QPI are
corporations formed under and governed by the laws of the state of
Delaware.[12]

B.   <u>Distributions to Investors and the Clawback</u>

The Fund made periodic distributions to its general partner,
QGP, which QGP, in turn, distributed *pro rata* to QGP's partners.[13]
Under the Fund Agreement, a copy of which is attached as Exhibit E
to the Strauss Dec., outside investors who formed the limited

---

[7]  Strauss Dec., Exhibits I and R.

[8]  Shields Dec., Exhibit 2; Hochman Dec., Exhibit 1 at 89:16.

[9]  Shields Dec., Exhibit 2.

[10]  <u>Id.</u>

[11]  Strauss Dec., Exhibit C.

[12]  <u>Id.</u>, Exhibits B, G and M.

[13]  <u>Id.</u>, Exhibit E at 27-28 § 4.2, Exhibit C at 9 § 4.1.

partners of the Fund (the "Fund's Limited Partners") were guaranteed a "Priority Return."[14]  Upon the Fund's dissolution, if the "Cumulative Return" to the Fund's Limited Partners was less than the Priority Return, then QGP, the general partner of the Fund, was obligated to repay to the Fund an amount sufficient to make up the shortfall in the Priority Return to the Fund's Limited Partners.[15]  The Offering Memorandum for the Fund states:

> [T]he General Partner will be obligated to return to the Partners any amount previously distributed to the General Partner as its carried interest to the extent such amount exceeds 20% of aggregate Net Profits overall.

Shields Dec., Exhibit 1 at 6.  This return of distributions is colloquially referred to as a "Clawback."[16]

Under Section 4.1 of the QGP Partnership Agreement (the "QGP Agreement"), a copy of which is attached as Exhibit C to the Strauss Dec., distributions were made to QGP's partners from "available cash," which term excludes cash that QPI, in QPI's discretion, determined to retain as a reserve for the Clawback and other liabilities.[17]  Under Section 16 of the QGP Agreement, QPI could not withhold a Clawback reserve from distributions to QGP's "Special Limited Partners," but QGP's Special Limited Partners had an express obligation to return their *pro rata* share of such distributions if needed for QGP to honor QPI's Clawback

---

[14]  Strauss Dec., Exhibit E at 4-5, 27-30.

[15]  Id., Exhibit E at 65-66 § 10.3.

[16]  Id., Exhibit H at 9.

[17]  Id., Exhibit C at 9 § 4.1.

obligation.[18]  The QGP Partnership Agreement is silent on what would happen if insufficient funds were withheld from the other non-"special" partners (the "Regular Limited Partners") such that QGP had insufficient funds to pay the Clawback.[19]

After the last of the Fund's investments was written down, QGP had a Clawback obligation of $33,928,688.[20]  QGP had reserved $10,300,000 from distributions for the Clawback, leaving a $23.6 million shortfall.[21]  QGP asserts that Debtor's pro rata share of this Clawback shortfall totals $2,913,748 -- $2,874,363 of which is attributable to Debtor's holdings in Pentoga Partners as a Regular Limited Partner of QGP, and $39,384 of which is attributable to

---

[18]  Strauss Dec., Exhibit C at 18 § 16.

[19]  Id., Exhibit C, *passim*.  It is worth noting here that the limited partnership through which Debtor held a partnership interest in QGP, namely Pentoga Partners, appears to have actually signed the QGP Agreement as a Special Limited Partner.  There is an asterisk by the signature block for Pentoga Partners.  The bottom of this signature page, as well as Section 16 of the QGP Agreement, indicate that this asterisk is meant to designate the party as a Special Limited Partner.  However, there is such an asterisk beside the signature block of every limited partner other than Jay Alix, who is designated as the "initial limited partner."  Both Debtor and QGP have treated Pentoga Partners as a Regular Limited Partner of QGP in their arguments.  It also appears from the evidence submitted that Pentoga Partners, as well as QGP's other limited partners who were held by the Fund's principals or insiders, were treated in the course of distributions made by QGP as Regular Limited Partners of QGP.  The Court will, therefore, assume that the placement of the asterisk beside the signature block of Pentoga Partners was an error.

[20]  Id., Exhibit H at 9.  See also Declaration of Arthur J. Kubert, filed May 18, 2007 (attached as Exhibit 3 to the Hochman Dec.) at ¶¶ 9-10.

[21]  Hochman Dec., Exhibit 3 (Declaration of Arthur J. Kubert filed May 18, 2007) at ¶ 7.

1 Debtor's interest in QPI, the general partner of QGP.[22]  Debtor

2 disputes that Debtor has any obligation under the Clawback.  All

3 other QGP Regular Limited Partners and QPI shareholders repaid

4 their proportionate share of the Clawback; only Debtor has failed

5 to do so.[23]

6

7 C.  <u>The Undertaking</u>

8     On August 13, 1998, QMC's managing director, Robert Shields,

9 requested in a distribution memorandum that the Regular Limited

10 Partners and QPI shareholders execute an Acknowledgment and

11 Undertaking (the "Undertaking"), a copy of which is attached as

12 Exhibit K to the Strauss Dec.[24]  The Undertaking states:

13     [T]he General Partner might not have sufficient funds to
      make good on its clawback obligation under Section 10.3 of
14    the Partnership Agreement.
      . . .
15
      [I]n consideration of the distributions previously made to
16    the undersigned, and to induce the General Partner and
      Questor Principals, Inc. to make distributions to the
17    undersigned in the future from time to time in the
      discretion of the General Partner and Questor Principals,
18    Inc., . . . the undersigned hereby irrevocably agrees and
      undertakes . . . to restore to the General Partner and to
19    Questor Principals, Inc. any distributions . . . made to
      the undersigned . . . to meet [QGP's] clawback obligations
20    under Section 10.3 of the Partnership Agreement.

21 Each of QGP's Regular Limited Partners and QPI shareholders signed

22 the Undertaking.[25]  Debtor executed two copies of the Undertaking on

23

24 _____

25     [22]  Hochman Dec., Exhibit 3 at ¶ 11.

26     [23]  Hochman Dec., Exhibit 3 at ¶ 12.

27     [24]  <u>Id.</u>, Exhibit 4 at ¶ 6; Strauss Dec., Exhibit F.

28     [25]  Strauss Dec., Exhibits D at 10:14-11:4 and L.

or about October 16, 1998 -- one on behalf of Pentoga Partners as its general partner and one individually as a shareholder of QPI.[26]

D.   Distributions Made by QGP to Debtor

Both Debtor and QGP agree that Debtor received a total of $3,799,328 in distributions from QGP.[27]  Most of those distributions were made after October 16, 1998, the date that Debtor signed the Undertaking.[28]  The evidence submitted by the parties, shows the following distributions made to Debtor by QGP:[29]

| Date | As Regular Limited Partner | As QPI shareholder |
|---|---|---|
| 3/14/98 | $50,343.00 | |
| 7/30/98 | $641,080.00 | $15,844.19 |
| 8/13/98 | Undertaking distributed | |
| 10/16/98 | Undertaking signed by Debtor | |
| 1/13/00 | $1,814,759.56 | $33,788.00 |
| 4/26/00 | $389,360.00 | $1,666.67 |
| 7/10/10 | $66,389.28 | |
| 8/17/00 | $503,966.48 | $6,000.00 |

As outlined above, Debtor received a total of $2,815,929.99 in distributions from QGP ($2,774,475.32 from his interest as a

---

[26]   Strauss Dec., Exhibit I.

[27]   Response of Debtor-In-Possession Edward L. Scarff to the Separate Statement of Undisputed Facts in Support of Questor General Partner, L.P.'s Motion for Summary Judgment, filed September 4, 2009, at ¶ 24.

[28]   Hochman Dec., Exhibit 3 at ¶ 8, Exhibit 4 at ¶ 10.

[29]   Declaration of Edward L. Scarff, Debtor-In-Possession, In Support of Opposition to Questor General Partner, L.P.'s Motion for Summary Judgment or Summary Adjudication of Issues on Objection to Proof of Claim #16, filed June 28, 2007.

1  Regular Limited Partner of QGP and $41,454.67 from his interest as

2  a shareholder of QPI) *after* Debtor's execution of the Undertaking.[30]

4  E.  The Exit Agreement

5      On March 31, 1999, Debtor and Mr. Klein entered into an

6  agreement with Mr. Lufkin, Mr. Alix, QPI, and QMC (the "Exit

7  Agreement").[31]  Under the Exit Agreement, Debtor and Klein sold

8  their stock in QMC, entered into consulting agreements with QMC

9  under which they were each paid $2,375,000, exchanged their voting

10 stock in QPI for non-voting stock, resigned their directorships and

11 terminated their status as principals.[32]  Debtor and Klein continued

12 to receive distributions after the effective date of the Exit

13 Agreement.[33]  Indeed, all distributions made to Debtor after his

14 execution of the Undertaking were also made after the effective date

15 of the Exit Agreement, as noted above.  Klein -- like every other

16 Regular Limited Partner other than Debtor -- has repaid his

17 proportionate share of the Clawback.[34]

---

[30]  No details were provided by the parties regarding the
$276,130.82 in distributions made to Debtor by QGP prior to
March 14, 1998.

[31]  Strauss Dec., Exhibit M.

[32]  Id., Exhibit M at ¶¶ 1(a), 5(b), 1(b), 2 and 4.

[33]  Id., Exhibits AA-GG.

[34]  Hochman Dec., Exhibit 3 at ¶ 12.

Case: 03-54723   Doc# 796   Filed: 10/14/10   Entered: 10/14/10 13:21:32   Page 9 of
42

F.  Debtor's Bankruptcy Filing and QGP's Claim

Debtor filed his Chapter 11 petition on July 21, 2003.[35]  On November 30, 2005, QGP filed a proof of claim in the amount of $2,913,748 on the basis of a "clawback claim."[36]  QGP amended this proof of claim on December 12, 2007.[37]  QGP's amended proof of claim seeks $2,913,748 on the following bases: (1) breach of contract for Debtor's alleged breach of the Undertaking, (2) promissory estoppel with respect to the Undertaking, (3) unjust enrichment, and (4) breach of fiduciary duty.[38]  QGP asserts that Debtor is responsible for Debtor's proportionate share of the balance owing on the Clawback, which totals $2,913,748 ($23,628,688 shortfall in the Clawback multiplied by Debtor's roughly 13.389% overall interest in QGP held by Debtor equals $3,163,748; $3,163,748 subtotal minus $250,000 in consulting fees owed to Debtor equals the $2,913,748 claim by QGP).[39]


II.

ANALYSIS

Both parties have moved for summary judgment in this matter. Federal Rule of Civil Procedure 56, made applicable by Bankruptcy Rule 7056, provides that summary judgment shall be granted where the

---

[35]  Strauss Dec., Exhibit N.

[36]  Strauss Dec., Exhibit I.  This proof of claim states that it "amends" an "informal" claim made on "October 2-3, 2003."

[37]  Strauss Dec., Exhibit R.

[38]  Id.

[39]  Id.

Case: 03-54723   Doc# 786   Filed: 10/14/10   Entered: 10/14/10 13:21:32   Page 10 of 42

pleadings, depositions, answers to interrogatories, admissions or affidavits show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); North Slope Borough v. Rogstad (In re Rogstad), 126 F.3d 1224, 1227 (9th Cir. 1997). "For an issue to be 'genuine,' there must be evidence such that a reasonable jury could reach a verdict in favor of the nonmoving party." Summers v. Teichert & Sons, Inc., 127 F.3d 1150, 1152 (9th Cir. 1997) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

The moving party has the burden of establishing the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. If the moving party meets this burden, the nonmoving party must go beyond the pleadings and identify facts demonstrating a genuine issue for trial. Id. at 324. Accordingly, the nonmoving party has a duty to present affirmative evidence in order to defeat a properly supported motion for summary judgment. Anderson, 477 U.S. at 257.

As set forth above, the parties agree on almost all of the underlying facts. The dispute between the parties is with respect to the legal implications of those facts. Therefore, this matter does appear to be ripe for summary adjudication. The issues of material fact **alleged** by each party with respect to the opposing party's motion for summary judgment are extremely limited.[40] The

---

[40] QGP's motion for summary judgment initially included QGP's claims for promissory estoppel and unjust enrichment. However, QGP withdrew these arguments in QGP's final reply at footnote 1. Questor General Partner, L.P.'s Reply in Support of Motion for Summary Judgment at 2 n.1. Therefore, QGP's motion for summary judgment rests solely upon QGP's claims of breach of contract under
(continued...)

only potential issues of material fact noted by QGP as precluding summary judgment in Debtor's favor relate to QGP's claims of promissory estoppel and breach of contract.[41] As to QGP's claim of promissory estoppel, QGP argues that the issue of whether QGP reasonably relied upon the promise of repayment made by Debtor in the Undertaking precludes the granting of summary judgment in Debtor's favor. As to QGP's breach of contract claim, QGP asserts that the issue of whether QGP owed a fiduciary duty to Debtor, given Debtor's status and various roles in the Fund-related entities, precludes the granting of summary judgment in Debtor's favor. In return, Debtor argues that the issue of whether Debtor played a role in the distributions made by the Fund and QGP -- specifically, whether and how distributions were made -- precludes summary judgment in QGP's favor on the issues of breach of fiduciary duty and breach of contract under the Undertaking.[42] The impact of these potential issues of material fact will be addressed below.

The cross-motions boil down to diametrically opposed legal arguments on five main issues:

(1)   Whether or not Debtor has a fiduciary duty to repay an amount equal to the value of Debtor's proportionate share of the Clawback;

---

[40](...continued)
the Undertaking and breach of fiduciary duty. However, Debtor seeks summary judgment with respect to QGP's claims for promissory estoppel and unjust enrichment.

[41]   Opposition of Questor General Partner, L.P. to Debtor's Motion for Summary Judgment, filed July 30, 2009, at 28:4.

[42]   Memorandum of Points and Authorities in Opposition to Motion of Questor General Partner, L.P. for Summary Judgment, filed September 4, 2009, at 8-9 and 18-19.

Case: 03-54723    Doc# 786    Filed: 10/14/10    Entered: 10/14/10 13:21:32    Page 12 of
42

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

(2)  Whether or not Debtor breached Debtor's contract with QGP under the Undertaking by not repaying the Clawback;

(3)  Whether QGP's claim for relief under the theory of promissory estoppel fails, as a matter of law, for lack of reasonable reliance;

(4)  Whether QGP's claim for relief under the equitable theory of unjust enrichment fails, as a matter of law, because an express contract controls the relationship between QGP and Debtor; and

(5)  Whether the applicable statute of repose bars QGP's claims for breach of fiduciary duty, promissory estoppel and unjust enrichment.

The Court will consider each of these issues separately.

A.  <u>Fiduciary Duty Owed by Debtor</u>

Both parties seek summary judgment as to QGP's claim of breach of fiduciary duty by Debtor.

QGP points out that Debtor was one of four principals of the Fund who controlled the Fund through the Fund's general partner, QGP.  These same four principals, notes QGP, served as directors of both QGP's corporate general partner, QPI, and QGP's manager, QMC. Under Delaware law, argues QGP, such principals have fiduciary duties that extend to QGP, the Fund and the Fund's investors.[43]  QGP argues that the distributions to Debtor were assets of the Fund of which Debtor was a fiduciary.  The distributions were made to QGP

_____

[43]  <u>In re USACafes, L.P. Litig.</u>, 600 A.2d 43, 49 (Del. Ch. 1991) (holding, in a suit by a class of limited partners, that individual directors of the limited partnership's corporate general partner owed fiduciary duties to the limited partnership in their directorial capacities, thereby rendering the individual directors amenable to personal jurisdiction under Delaware Code § 3114); <u>In re Integrated Resources, Inc.</u>, No. 90-B-10411 (CB), 1990 WL 325414 (Bankr. S.D.N.Y. Oct. 22, 1990) (holding, under Delaware law, that the parent of the general partner of a limited partnership owed a fiduciary duty to the limited partners not to sell a controlling interest in the general partner to a looter).

Case: 03-54723   Doc# 786   Filed: 10/14/10   Entered: 10/14/10 13:21:32   Page 13 of 42

 1   subject to the Clawback.  To retain the funds in the face of the

 2   Clawback obligation is "to use control over the partnership's

 3   property to advantage the corporate director at the expense of the

 4   partnership."  <u>In re USACafes, L.P. Litig.</u>, 600 A.2d 43, 49 (Del.

 5   Ch. 1991).

 6        As evidence of the industry standard for private equity

 7   investment firms, QGP cites JAMES SCHELL, PRIVATE EQUITY FUNDS: BUSINESS

 8   STRUCTURE AND OPERATIONS (2007) ("PRIVATE EQUITY FUNDS").  The treatise was

 9   submitted as an exhibit to the declaration of Harry Hochman, an

10   attorney for QGP, in support of QGP's motion for summary judgment.

11   Hochman Dec., Exhibit 2.  Debtor has objected to QGP's references to

12   PRIVATE EQUITY FUNDS as "inadmissible hearsay on the purported practice

13   in the private equity industry."  Memorandum of Points and

14   Authorities in Opposition to Motion of Questor General Partner, L.P.

15   for Summary Judgment, filed September 4, 2009, at 6 n.4.  Since

16   Federal Rule of Evidence 803(18) has not been satisfied, the

17   treatise is not admissible, and Debtor's objection is sustained.

18        Debtor, in turn, argues that QGP has failed to establish a

19   fiduciary duty owed by Debtor to QGP, the Fund or the Fund's

20   investors.  Debtor argues that the term "principal" is used

21   ambiguously in the Fund Agreement and Offering Memorandum.  Debtor

22   insists Debtor's role as a "principal" had nothing to do with the

23   administration of the Clawback or the distributions made by the Fund

24   and QGP.  Debtor correctly points out that the record does not show

25   any hands-on control or participation by Debtor with respect to

26   distributions made by the Fund and QGP.  Debtor insists that

27   Debtor's sole roles in the Fund were to find and evaluate

28   investments.  Finally, Debtor notes that Debtor never owned a

Case: 03-54723   Doc# 786   Filed: 10/14/10   Entered: 10/14/10 13:21:32   Page 14 of
42

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

majority interest in QPI or QMC and, therefore, did not owe any fiduciary duties as a controlling shareholder.

QGP responds that, even though Debtor may not have participated in the day-to-day mechanics of the distributions, Debtor was well-advised of, and in fact was one of four principals who controlled, the overall operations and financial condition of the Fund and the Fund's component parts. QGP argues that while Debtor could not unilaterally decide whether distributions should be made or in what amount, Debtor, as a director of QMC and QPI, had a fiduciary obligation to voice any opposition or disagreement Debtor may have had with respect to such distributions.

To find in QGP's favor on this cause of action, the Court must find (1) Debtor had a fiduciary duty to the Fund and the Fund's investors and (2) such a fiduciary duty created an implicit Clawback obligation by Debtor. The Delaware Revised Uniform Limited Partnership Act, 6 Del. C. § 17-101, et seq. (the "DRULPA") does not specifically set forth the scope of the duties a partner owes to the limited partnership and to other partners, nor does the DRULPA state whether any such duty even exits.[44] However, Delaware courts have held that an entity controlling a general partner may owe fiduciary duties to a limited partnership and the limited partners thereof to the extent that such general partner controls property of the limited partnership for the benefit of the entity.[45] Delaware

---

[44] James G. Leyden & Laura Dietrich, *Delaware Limited Liability Companies and Limited Partnership*, 1782 PLI/CORP 43, 58 (2010).

[45] USACafes, 600 A.2d 43; Integrated Resources, 1990 WL 325414 (citing Delaware cases).

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

courts have "recognized the broad rights of partners to contractually define their business understanding as well as to modify fiduciary duties that may otherwise be applicable."[46]  If the terms of a limited partnership agreement do not define the fiduciary duty of a partner, manager, or other person controlling a limited partnership, "such duty and liability for breach of such duty will be left for the courts to define."[47]

The Fund Agreement, Offering Memorandum and QGP Agreement clearly set forth the general concept of a Priority Return to the Fund's Limited Partners, a Clawback obligation by QGP, and, as stated in the Fund Agreement, "fiduciary obligations" by the four principals to the Fund and the Fund's component parts.  Neither party has cited any provision in the Fund Agreement, QGP Agreement, or other document whereby the parties indicated a "clear intent" to preempt the default fiduciary duties of the parties to the QGP and

---

[46]  Leyden, *supra* note 44, at 59 (citing Twin Bridges L.P. v. Draper, C.A. No. 2351-VCP, slip op. at 31 (Del. Ch. Sept. 14, 2007) (holding that for fiduciary duties, "unless the partnership agreement is silent or ambiguous, a court will not look for extrinsic guidance elsewhere, so as to give maximum effect to the principle of freedom of contract and maintain the preeminence of the intent of the parties to the contract." (footnotes and quotations omitted)); Cont'l Ins. Co. v. Rutledge & Co., 750 A.2d 1219, 1235 (Del. Ch. 2000) ("Where a contract clause amends the fiduciary duties a general partner owes the limited partners, a court will give full force to the terms of the contract." (footnote omitted)); Gotham Partners L.P. v. Hallwood Realty Partners L.P., C.A. No. 15754, 2000 WL 1476663, at *10 (Del. Ch. Sept. 27, 2000) (noting that Section 17-1101(d)(2) of the DRULPA "expressly authorizes the elimination, modification, or enhancement of these fiduciary duties in the written agreement governing the limited partnership." (footnote omitted)); Sonet v. Timber Co., L.P., 722 A.2d 319 (Del. Ch. 1998) ("[P]rinciples of contract preempt fiduciary principles where the parties to a limited partnership have made their intention to do so plain.")).

[47]  Leyden, *supra* note 44, at 61-62 (citations omitted).

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1  Fund limited partnerships.[48]  Even if Debtor did not have direct

2  control over the distributions made to QGP's limited partners,

3  Debtor was an insider with extensive knowledge and control of the

4  financial condition and operations of the Fund and its component

5  parts.  Given Debtor's position and knowledge of a potential

6  Clawback obligation by QGP, it is only equitable to recognize a

7  fiduciary duty by Debtor to QGP, the Fund, and the Fund's outside

8  investors.

9      A much harder question is whether this fiduciary duty survived

10  the Exit Agreement.  This is Debtor's final defense to QGP's claim

11  of breach of fiduciary duty by Debtor.  The Exit Agreement is dated

12  March 31, 1999.  The vast majority of the distributions made to

13  Debtor from QGP -- in fact, the entire $2,815,929.99 in post-

14  Undertaking distributions at issue herein -- were made after the

15  effective date of the Exit Agreement.  Through the Exit Agreement,

16  Debtor sold his stock in QMC, entered into a $2,375,000 consulting

17  agreement with QMC, exchanged his voting stock in QPI for non-voting

18  stock, resigned his directorships in Fund-related entities and

19  terminated his status as "principal."  With respect to his former

20  roles as a director and/or officer of various Fund-related entities,

21  Debtor notes that "[t]he fiduciary relationship between a

22  corporation and an officer or director terminates when the person

23  ceases to act as such because of resignation or removal."  WILLIAM E.

24  KNEPPER & DAN A. BAILEY, LIABILITY OF CORPORATE OFFICERS AND DIRECTORS § 1.07[1]

25  (7th ed. 2007).  See also 18B AM. JUR. 2D Corporations § 1461 (2008)

26  ("After there has been a severance of official relationship, either

27  _____

28      [48] Sonet, 722 A.2d at 322.

Case: 03-54723   Doc# 786   Filed: 10/14/10   Entered: 10/14/10 13:21:32   Page 17 of
42

because of resignation or removal, generally, a director or officer occupies no relation of trust or confidence to the corporation.").

The problem with Debtor's argument with respect to the Exit Agreement, as rightfully noted by QGP, is that Debtor did *not* cleanly break Debtor's ties and disassociate from the Fund and the Fund's related entities. Debtor entered into a very lucrative consulting agreement with QMC. Debtor also continued Debtor's status as a Regular Limited Partner of QGP, although there appears from the correspondence to have been at least some initial discussions of making Debtor a Special Limited Partner of QGP instead. Shields Dec., Exhibit 3. Debtor's decision to remain a Regular Limited Partner appears to be a deliberate and very significant distinction. As noted by QGP, Debtor "voluntarily continued to receive funds that were being distributed by fiduciaries to fiduciaries" rather than taking himself out of that loop and electing to be treated as a non-insider, Special Limited Partner. Memorandum of Points and Authorities in Support of Questor General Partner, L.P.'s Motion for Summary Judgment ("QGP's MPA") at 14:12-14. Even after the Exit Agreement, Debtor appears to have been in a position of "trust" and "confidence" in Debtor's dealings with QGP and the Fund's other component parts. BLACK'S LAW DICTIONARY (9th ed. 2009) (definition of "fiduciary"); 18B AM. JUR. 2D *Corporations* § 1461 (2008).

Debtor continued to play extensive roles in the Fund and the Fund's component parts, even after Debtor's execution of the Exit Agreement. The Exit Agreement does not clearly indicate a specific intent to eliminate any fiduciary duties owed by Debtor. To the contrary, the Exit Agreement states:

Case: 03-54723    Doc# 786    Filed: 10/14/10    Entered: 10/14/10 13:21:32    Page 18 of
42

> [N]othing in this Agreement is intended to affect any of
> the rights or obligations of [Debtor or his affiliates] as
> limited partners in Questor General Partner, L.P. or
> Questor Side-by-Side Partners, L.P. or Questor Partners
> Fund, L.P.

Strauss Dec., Exhibit M at ¶ 4. For these reasons, the Court finds that Debtor continued to owe a fiduciary duty to QGP, the Fund and their respective limited partners even after Debtor's execution of the Exit Agreement.

The Court finds that no genuine issue of material fact exists with respect to Debtor's role as a fiduciary of QGP, the Fund and the Fund's other component parts. Summary judgment is warranted in QGP's favor as to QGP's claim of breach of fiduciary duty, subject only to the Court's consideration of the issue of the statute of repose, which will be discussed below.

B.   Breach of Contract Under the Undertaking

The primary cause of action asserted in QGP's amended proof of claim is breach of contract, specifically Debtor's alleged breach of the Clawback obligations set forth in the Undertaking. QGP argues that the Undertaking constituted an executory contract between QGP and Debtor under which Debtor agreed to return the sums necessary to satisfy the Clawback in order to induce QGP to make further distributions to Debtor. The Undertaking became non-executory, QGP asserts, upon QGP's performance in making such further payments. QGP argues Debtor has breached the Undertaking by failing to repay the $2,913,748 owed to satisfy the Clawback.

Debtor raises several defenses to this breach of contract claim. First, Debtor argues the Undertaking is unenforceable for lack of consideration. Next, Debtor argues that the Undertaking constitutes

an invalid amendment to the QGP Agreement. Finally, Debtor asserts the Undertaking is unenforceable because it was obtained through QGP's failure to disclose the materiality of the change effected by the Undertaking, thereby constituting a breach of the fiduciary duty owed by QGP to Debtor as one of its partners.

### 1. Lack of Consideration

"A valid contract 'requires good or valuable consideration.'" Frazier v. Am. Airlines, Inc., 434 F.Supp.2d 279, 291 (D. Del. 2006) (quoting Haft v. Dart Group Corp., 841 F.Supp. 549, 573 (D. Del. 1993)). Consideration is that which is given to induce a promise or performance in return. Affiliated Enterprises, Inc. v. Waller, 5 A.2d 257, 259 (Del. Super. Ct. 1939). Under Delaware law, "consideration for a contract can consist of either a benefit to the promiser or a detriment to the promisee." First Mortgage Co. of Pa. v. Fed. Leasing Corp., 456 A.2d 794, 795-96 (Del. 1982).

With respect to Debtor's lack of consideration defense, Debtor correctly notes that prior distributions -- which the Undertaking itself states are part of the consideration given by QGP -- are not valid consideration to make a contract enforceable. Cont'l Ins. Co. v. Rutledge & Co., Inc., 750 A.2d 1219, 1232 (Del. Ch. 2000) (citing McAllister v. Kallop, Civ. A. No. 12856, mem. op. at 14, 1995 WL 462210, at *14-*15 (Del. Ch. July 28, 1995)). Next, Debtor argues that QGP's promise to make future distributions, in the sole discretion of QGP and QPI, is illusory and, therefore, also invalid as consideration. See Superior Tube Co. v. Del. Aircraft Indus., 4 F.R.D. 139, 140 n.3 (D. Del. 1944); Lowe's of Hagerstown, Inc. v. Nanticoke Real Estate, Inc., No. C.A. 78C-MY4, 1979 WL 181201, at *2 (Del. Super. Ct. May 5, 1979). Finally, Debtor asserts QGP's

subsequent distributions do not constitute consideration because QGP had a pre-existing duty under the QGP Agreement to pay Debtor if QGP paid any other Regular Limited Partner.  <u>First State Staffing Plus, Inc. v. Montgomery Mut. Ins. Co.</u>, No. Civ. A.   2100-S, 2005 WL 2173993, at *9 (Del. Ch. Sept. 6, 2005) (citing <u>Cont'l Ins. Co.</u>, 750 A.2d at 1232); <u>Seidel v. Lee</u>, 954 F.Supp. 810, 817 (D. Del. 1996) (citing RESTATEMENT (SECOND) OF CONTRACTS § 73 (1979)).

    QGP does not contest the argument that distributions made prior to Debtor's execution of the Undertaking cannot serve as the consideration given for the contractual obligations provided in the Undertaking.  However, "[t]he fact that part of what is bargained for would not have been consideration if that part alone had been bargained for does not prevent the whole from being consideration." RESTATEMENT (SECOND) OF CONTRACTS § 80(2) (1979).  Therefore, the Court must determine whether the distributions made by QGP after Debtor executed the Undertaking suffice as the consideration given by QGP for Debtor's obligation under the Undertaking to return the funds to cover any Clawback obligation if and when asked to do so.

    First, QGP responds to Debtor's defense that QGP's promise to make future distributions in QGP's sole and absolute discretion was illusory consideration and insufficient to make the Undertaking binding upon Debtor.  QGP notes that: "Where a contract is executory, the promises of each party supply the consideration necessary to support the promises of the other. . . . [A] conditioned promise becomes absolute when the condition is performed." <u>Mobil Oil Corp. v. Wroten</u>, 303 A.2d 698, 701 (Del. Ch. 1973), <u>aff'd</u>, 315 A.2d 728 (Del. 1973).  Therefore, argues QGP, when QGP decided it was appropriate to make a further distribution after

the execution of the Undertaking, QGP's performance in making such a
distribution made the Undertaking non-executory and, therefore,
binding upon Debtor.

Finally, QGP responds that Debtor's last defense -- that QGP had
a pre-existing obligation to make a distribution to Debtor if QGP
made a distribution to any other Regular Limited Partner -- is a red
herring. Although it may be true that QGP was obligated under the
QGP Agreement to make a distribution to Debtor *if* QGP made a
distribution to any other Regular Limited Partner, QGP was not
required to make *any* distribution to such Regular Limited Partners.

Mr. Shields stated in his declaration that QGP "would have
reserved such funds rather than distribute them" if the Regular
Limited Partners had failed to execute the Undertaking. Hochman
Dec., Exhibit 4 at ¶ 18. While Debtor contends that this was never
communicated to him, Debtor's subjective understanding or intent is
irrelevant. For the same reason, however, the Court finds Mr.
Shield's statement equally irrelevant. The motivations of the
parties in entering into the contract are irrelevant.

> Under Delaware law, the proper interpretation of language
> in a contract is a question of law. When interpreting a
> contract, a court's task is to satisfy the reasonable
> expectations of the parties at the time they entered into
> the contract. In doing so, a court will only look at
> evidence outside the contract where the provisions in
> controversy are reasonably or fairly susceptible of
> different interpretations or may have two or more different
> meanings.

Alliance Data Sys. Corp. v. Blackstone Capital Partners V L.P., 963
A.2d 746, 759-60 (Del. Ch. 2009) (citations and quotations omitted).
With respect to provisions of a limited partnership agreement:

Case: 03-54723   Doc #786   Filed: 10/14/10   Entered: 10/14/10 13:21:32   Page 22 of
42

Only if the partners have not expressly made provisions in their limited partnership agreement or [] the agreement is inconsistent with mandatory statutory provisions, will [a court] look for guidance from the statutory default rules, traditional notions of fiduciary duties, or other extrinsic evidence.

5 In re LJM2 Co-Investment, L.P., 866 A.2d 762, 777 (Del. Ch. 2004).

6 The simple controlling fact is that nothing in the QGP Agreement

7 *obligated* QGP to make distributions to the Regular Limited Partners

8 rather than reserve such funds for potential future liabilities --

9 either before or after the execution of the Undertaking.  There is

10 no ambiguity on this point.

11     Debtor argues that this position is "absurd because such conduct

12 would have violated QGP's purported contractual obligations

13 to the other limited partners who had signed the Undertaking."

14 Memorandum of Points and Authorities in Support of Motion of Debtor-

15 in-Possession Edward L. Scarff for Summary Judgment on Questor

16 General Partner, L.P.'s Amended Proof of Claim ("Debtor's MPA") at

17 14:7-9.  The Court disagrees.  While Debtor is correct that the QGP

18 Agreement requires distributions to be made to all Regular Limited

19 Partners if a distribution is made to any individual Regular Limited

20 Partner, QGP was under no obligation to make any distributions to

21 any of the Regular Limited Partners -- even after the execution of

22 the Undertaking.

23     The issue of consideration for the Undertaking also arises in

24 another context not addressed by the parties -- could there have

25 been consideration for the Undertaking if Debtor had a pre-existing

26 fiduciary duty to return Debtor's proportionate share of the

27 Clawback?  Consideration is some right, interest, profit or benefit

28 accruing to one party, or some forbearance, detriment, loss or

1  responsibility, given, suffered, or undertaken by the other.

2  RESTATEMENT (SECOND) OF CONTRACTS §§ 17(1), 71 (1979).  The consideration

3  given in the Undertaking was not only an agreement by Debtor to

4  return distributions made to Debtor to the extent necessary to

5  satisfy the Clawback.  The consideration also included the addition

6  of a clearly defined, written contractual obligation to the

7  harder-to-enforce equitable remedy (of the Regular Limited Partners'

8  fiduciary obligations), which gave QGP the comfort level necessary

9  to allow QGP to make the interim distributions requested by the

10 Regular Limited Partners.  The Court finds that QGP's breach of

11 contract cause of action is an alternative basis of recovery by QGP;

12 and the breach of contract and breach of fiduciary duty causes of

13 action are not mutually exclusive.

14    The Court finds QGP's points well-taken on this issue and finds

15 that the Undertaking does not fail for lack of consideration.

16 **2.    Invalid Amendment to QGP Agreement**

17    Both parties now acknowledge that there is no **express** Clawback

18 obligation by Debtor under either the Fund Agreement or the QGP

19 Agreement.[49]  Debtor argues that the applicable contract between the

20 parties was the QGP Agreement.  Since the QGP Agreement references a

21 Clawback obligation but limits the Clawback obligation to the

22 Special Limited Partners, the contract is not ambiguous as to

23 whether Debtor had a Clawback obligation.  If the contract is not

24 ambiguous, argues Debtor, then a Clawback obligation on the Debtor's

25

26 _____

27    [49]   Strauss Dec., Exhibit R; Debtor's MPA at 15:5-7.  QGP does
   argue, however, that such a Clawback obligation can be inferred,

28 even before the existence of the Undertaking, from the fiduciary
   duty owed by Debtor to QGP and the Fund, as discussed earlier.

part cannot be implied through the use of extrinsic evidence --
*i.e.*, the Undertaking. See <u>Express Shuttle, Inc. v. Older</u>, No.
Civ.A. 19596, 2002 WL 31458243, at *6 (Del. Ch. Oct. 23, 2002);
<u>United Rentals, Inc. v. Ram Holdings, Inc.</u>, 937 A.2d 810, 830 (Del.
Ch. 2007).

What Debtor's argument fails to account for, however, is raised
by Debtor in another context -- while the QGP Agreement may not be
ambiguous, the Undertaking was, to use the Court's own words from a
prior hearing as quoted by Debtor, a "very substantial change" in
the contractual rights between the parties. Strauss Dec., Exhibit Q
at 7:6-9. In other words, the Undertaking was an amendment to the
contract between the parties. Black's Law Dictionary defines
"amendment" as:

> A formal revision or addition proposed or made to a
> statute, constitution, pleading, order, or other
> instrument; specif., a change made by addition, deletion,
> or correction; esp., an alteration in wording.

BLACK'S LAW DICTIONARY (9th ed. 2009) (definition of "amendment"). See
also <u>Katell v. Morgan Stanley Group, Inc.</u>, Civ. A. No. 12343, 1993
WL 390525, at *1 n.1, 19 Del. J. Corp. L. 797, 799 n.1 (Del. Ch.
Sept. 27, 1993) (modification changing authority to settle
litigation from two partners to one partner constituted an amendment
to the partnership agreement).[50] Through the Undertaking, the
Regular Limited Partners agreed to take on an additional contractual

---

[50] QGP suggests that the Undertaking may instead be viewed as
an independent contract between the parties. However, the Court
finds it very difficult to view these obligations as truly
independent when the very purpose of the Undertaking was to
influence the later distributions made by QGP under the QGP
Agreement.

1   responsibility -- *i.e.*, to return to funds paid, if necessary -- to

2   reduce QGP's risks of a potential Clawback shortfall and thereby

3   induce QGP to make future distributions to the Regular Limited

4   Partners at a time when QGP may not have otherwise done so.

5       This leads to Debtor's next defense to the enforceability of the

6   Undertaking -- was the Undertaking an improper and unenforceable

7   amendment to the Partnership Agreement?  Debtor notes that the QGP

8   Agreement requires "written consent" of a "majority of the total

9   [Regular Limited Partner] interests" for an amendment to be

10  effective.  Strauss Dec., Exhibit C at 18-19 § 17.  Debtor argues

11  that "written consent" necessarily means *informed* written consent.[51]

12  Debtor argues that instead of giving full and fair disclosure

13  regarding the materiality of the change effected by the Undertaking,

14

---

15      [51]  Debtor cites no controlling authority under the limited
    partnership laws of the state of Delaware, but notes that "in the
16  absence of Delaware authorities addressing an issue in the limited
    partnership context, analogues to corporate law may be applied."
17  Debtor's MPA at 16 n.1 (quoting Katell v. Morgan Stanley Group,
    Inc., Civ. A. No. 12343, 1993 WL 205033, at *2 (Del. Ch. June 8,
18  1993)).  With respect to informed consent under Delaware corporate
    law, Debtor cites Malone v. Brincat, 722 A.2d 5, 12 (Del. 1998)
19  (under Delaware corporate law, board must disclose fully and fairly
    all material information when it seeks shareholder action); Zaucha
20  v. Brody, Civ. A. 15638-ND, 1997 WL 305841, at *5 (Del. Ch. June 3,
    1997), aff'd, 697 A.2d 749 (Del. 1997) (full and fair disclosure
21  required by board when seeking shareholders' written consent);
    Millenco L.P. v. meVC Draper Fisher Jurveston Fund I, Inc., 824
22  A.2d 11, 19 (Del. Ch. 2002) (invalidating election of directors
    because of omission from proxy materials of information bearing on
23  the independence of two directors); and In re Centcom Cable Income
    Partners, L.P. Litig, No. C.A. 14634, 2000 WL 640676 (Del. Ch.
24  May 5, 2000) (finding limited partners did not impliedly amend the
    partnership agreement to allow termination of priority
25  distributions when the limited partners approved a sales
    transaction authorizing the sale of the partnership).  Further,
26  Debtor argues that all ambiguities are resolved against QGP as the
    drafter of the contract.  Katell, 1993 WL 205033 at *4; Strauss
27  Dec., Exhibit D at 25:15-26:7, 27:15-20.

28

the memorandum accompanying the Undertaking presents the endorsement of the Undertaking as simply a way to "confirm" a supposedly previous obligation and as a housekeeping matter "for good order's sake." See Strauss Dec., Exhibit Q at 53:5-20; Strauss Dec., Exhibit F at 2.

QGP responds that if the Undertaking is considered an amendment to the QGP Agreement, then the Undertaking is a valid and enforceable amendment to the contract. First, QGP argues, without citing any authority, that partners may freely amend their partnership agreements at any time and no consideration is necessary. Therefore, per QGP, Debtor's defense that the Undertaking lacked consideration fails ipso facto.

Next, QGP notes that the amendment of a Delaware limited partnership agreement is governed by the DRULPA, which "embodies the policy of freedom of contract and maximum flexibility."[52] QGP notes that Delaware partnership agreements may be amended by letter agreements or side letters,[53] and may even be deemed to have been amended orally, or by a course of conduct, even where, as here, the partnership agreement requires amendments to be in writing.[54] Thus, says QGP, the written Undertaking would certainly "qualify as an amendment under Delaware law." QGP's MPA at 18:22-23.

---

[52] Gotham Partners, L.P. v. Hallwood Realty Partners, L.P., 817 A.2d 160, 170 (Del. 2002) (citations and quotations omitted). See also DEL. CODE ANN. tit. 17, § 1101(c).

[53] Pami-Lemb I Inc. V. Emb-Nhc, LLC, 857 A.2d 998, 1003 (Del. Ch. 2004).

[54] Continental Ins. Co., 750 A.2d at 1229 ("[I]t is settled law that contract provisions deeming oral modifications unenforceable can be waived orally or by a course of conduct just like any other contractual provision.").

1    Although formal written consent is not required for an amendment

2  under the DRULPA, QGP argues that such formal written consent was,

3  in fact, given.  The Undertaking was executed by all of the

4  shareholders and directors of QGP's general partner, QPI, as well as

5  all of the Regular Limited Partners of QGP.  This written consent to

6  the amendment by the parties satisfies even the requirements of

7  Section 17 of the QGP Agreement.  Even without Debtor's written

8  consent to the Undertaking, the Undertaking was still approved by a

9  majority of the impacted parties, which is sufficient to make the

10  amendment enforceable.

11    Next, QGP argues that Debtor is barred from even challenging the

12  Undertaking as an unenforceable amendment.  Debtor signed the

13  Undertaking in 1998 and did not suggest that the Undertaking may

14  have been an improper amendment to the QGP Agreement until 2007,

15  some nine years later.  QGP argues it would be inequitable to allow

16  Debtor to challenge the Undertaking years later.  Simon v. Navellier

17  Series Fund, 2000 WL 1597890, at *8 n.38 (Del. Ch. Oct. 19, 2000)

18  (stating that it would be inequitable to allow a party to raise a

19  challenge seven years after an amendment) (citing Cont'l Ins. Co.,

20  750 A.2d at 1240 ("one who has full knowledge of and accepts the

21  benefits of a transaction may be denied equitable relief if he or

22  she thereafter attacks the same transaction")).

23    Finally, QGP addresses Debtor's arguments regarding "informed

24  consent" and the alleged failure to communicate the materiality of

25  the change effected by the Undertaking.  QGP argues that the cases

26  cited by Debtor -- Brincat and Cencom Cable -- do not support

27  Debtor's argument.  QGP notes that the "informed consent" at issue

28  in both of those cases was class-based, meaning disclosures made to

MEMORANDUM DECISION ON CROSS-MOTIONS                Case No. 03-54723 ASW
FOR SUMMARY JUDGMENT                                        28

1  the entire shareholder class eligible to vote on the issue, not

2  individually-based.  The other members of the "class" impacted by

3  the Undertaking are the other Regular Limited Partners of QGP and

4  shareholders of QPI -- all of whom executed the Undertaking,

5  returned their pro rata portion of the Clawback when requested to do

6  so, and presumably are additionally at risk of being responsible for

7  the unpaid portions of the Clawback attributable to Debtor.  No

8  other member of this "class" has alleged being misled or not fully

9  informed with respect to the Undertaking.  Debtor's purported

10  misunderstanding does not, per QGP, vitiate the acceptance of the

11  Undertaking as an amendment to the QGP Agreement by every other

12  member of this class.  In addition, QGP notes that unlike the

13  shareholders in *Brincat* and *Cencom Cable*, "[Debtor] is not in the

14  position of a poorly informed, passive investor.  He was a fully

15  participating director of QPI and QMC and a Principal of the Fund."

16  QGP's MPA at 21:6-8.

17      Once again, the Court finds QGP's arguments well-taken.  The

18  Court finds that the requirements of both Section 17 of the QGP

19  Agreement and the DRULPA are met such that the Undertaking is a

20  valid amendment to the QGP Agreement.  Although the language of the

21  transmittal letter by Mr. Shield's accompanying the Undertaking may

22  appear, standing alone and in the absence of the extensive

23  relationship between the parties, to gloss over the contractual

24  change created, the record clearly demonstrates that Debtor was not

25  a misled, poorly informed, passive investor being taken advantage of

26  by insiders.  While the Undertaking effectuated a substantial change

27  in the contractual relationship between the parties, the

28  Undertaking, at the same time, merely documented a pre-existing

fiduciary obligation owed by Debtor, as discussed above, to return Debtor's proportionate share of the Clawback. When the pre-existing fiduciary obligation is considered, Mr. Shield's description in his cover letter and the lack of any opposition to the Undertaking by the Regular Limited Partners are quite understandable and not at all "dramatic." The Undertaking was an amendment to the contractual relationship between the parties made for the benefit of the Regular Limited Partners, including Debtor.

### 3. Breach of Fiduciary Duty owed by QGP to Debtor

The final defense raised by Debtor in response to QGP's claim of breach of contract is an alleged breach of fiduciary duty owed by QGP to Debtor. Debtor notes, "Absent a contrary provision in the partnership agreement, the general partner of a Delaware limited partnership owes the traditional fiduciary duties of loyalty and care to the Partnership and its partners." Gotham Partners, L.P. v. Hallwood Realty Partners, L.P., 2000 WL 1476663, at *11, 27 Del. J. Corp. L. 247 (Del. Ch. Sept. 27, 2000) (footnote omitted). Debtor asserts that QGP breached QGP's fiduciary obligations to Debtor by failing to disclose the materiality of the change purportedly effected by the Undertaking.

QGP responds to this argument by pointing out that Debtor himself was a director of QPI and QMC, the general partner and manager of QGP. For that reason, QGP argues that the fiduciary duty was owed by Debtor, not to Debtor. At best, asserts QGP, this issue raises a question of fact which would preclude summary judgment in Debtor's favor.

This defense by Debtor is essentially the same as Debtor's materiality argument on the issue of an alleged improper amendment

1   to the QGP Agreement.  For the same reasons as noted above, the

2   Court finds this defense equally unpersuasive when viewed as a

3   potential fiduciary duty owed to Debtor.  Again, the record clearly

4   shows that Debtor was not a naive, ill-advised, passive investor.

5   Debtor was a highly sophisticated investor and one of four

6   principals who held various roles and titles in the make-up of the

7   Fund's component parts.

8        Although the *Gotham Partners* decision cited by Debtor references

9   the default rule of a fiduciary duty standard of care from a general

10  partner to a limited partner, *Gotham Partners* goes on to recognize:

11       But § 17-1101(d)(2) of DRULPA expressly authorizes the
         elimination, modification, or enhancement of these
12       fiduciary duties in the written agreement governing the
         limited partnership. . . . Therefore, where the Partnership
13       Agreement provides the standard that will govern the duty
         owed by a General Partner to its partners in self-dealing
14       transactions, it is the contractual standard and not the
         default fiduciary duty of loyalty's fairness standard that
15       exclusively controls.

16  Gotham Partners, 2000 WL 1476663 at *10.  The Delaware Chancery

17  Court has also held:

18       Thus where the parties have a more or less elaborated
         statement of their respective rights and duties, absent
19       fraud, those rights and duties, where they apply by their
         terms, and not the vague language of a default fiduciary
20       duty, will form the metric for determining breach of duty.

21  In re Marriott Hotel Properties II Ltd. P'ship Unitholders Litig.,

22  1996 WL 342040, at *5 (Del. Ch. June 12, 1996).  The Court finds

23  that the various agreements and relationships between Debtor and the

24  other principals constitute such an elaborated statement of rights

25  and duties, and it would be inappropriate to impose the more

26  general, default fiduciary duty owing by a general partner to a

27  passive limited partner in this context.

28

MEMORANDUM DECISION ON CROSS-MOTIONS                    Case No. 03-54723 ASW
FOR SUMMARY JUDGMENT                                    31

Summary judgment in QGP's favor is merited on the basis of QGP's claim of breach of contract since the defenses raised by Debtor to QGP's breach of contract claim fail as a matter of law, QGP has made a prima facie showing, and Debtor has failed to identify a genuine issue of material fact.

C.   Promissory Estoppel

Debtor's motion also includes a request for summary judgment as to QGP's claim for recovery under the theory of promissory estoppel.[55]

> In order to establish a claim for promissory estoppel, a plaintiff must show by clear and convincing evidence that: (i) a promise was made; (ii) it was the reasonable expectation of the promisor to induce action or forbearance on the part of the promisee; (iii) the promisee reasonably relied on the promise and took action to his detriment; and (iv) such promise is binding because injustice can be avoided only by enforcement of the promise.

Lord v. Souder, 748 A.2d 393, 399 (Del. 2000) (citing Keating v. Board of Educ. Of Appoquinimink School Dist., 1993 WL 460527, at *4 (Del. Ch. Nov. 3, 1993)).

QGP argues that each of these elements is present with respect to QGP's claim against Debtor. In signing the Undertaking, Debtor communicated to QGP that Debtor would return Debtor's share of any subsequent distributions made to Debtor if necessary to satisfy the Clawback obligation. QGP asserts QGP reasonably relied on this promise in making distributions. All of QGP's Regular Limited Partners made such a promise of repayment, and each distribution that was made to them included a note reminding the Regular Limited

[55]   See footnote 40 supra.

Partners of such. Every other Regular Limited Partner has remitted that limited partner's proportionate share of the Clawback and honored this promise to QGP.

Debtor responds that QGP cannot establish the element of reasonable reliance and, therefore, QGP's entire claim of promissory estoppel fails. First, Debtor argues that QGP's behavior fails to show QGP relied in any way on the alleged promise made through the Undertaking. For some time after the Undertaking, QGP continued to distribute and escrow roughly the same percentages of carried profits that QGP had distributed and reserved prior to the Undertaking.

Next, Debtor argues that even if reliance is met, such reliance could not have been "reasonable." Debtor notes that the Undertaking imposed upon Debtor an obligation not contained in the QGP Agreement. Rather than disclosing this material change, the Undertaking was presented to Debtor as a general housekeeping matter merely confirming -- "for good order's sake" -- a pre-existing Clawback obligation. Strauss Dec., Exhibit F at 2. Debtor argues that this nondisclosure was a breach of the fiduciary duty of disclosure owed to Debtor as a limited partner by QGP. Because the "promise" of repayment was obtained through a breach of this fiduciary duty owed to Debtor, QGP, as a matter of law, could not have reasonably relied on the alleged promise. Notwithstanding the express language of the Undertaking itself -- which states the Undertaking is being made "to induce [QGP] and [QPI] to make distributions to the undersigned in the future" -- Debtor insists Debtor was never told Debtor's execution of the Undertaking was

necessary to induce QGP to make future distributions.  Strauss Dec.,
Exhibit K.

Again, the Court finds the facts do not support Debtor's
arguments.  The Undertaking and each transmittal letter accompanying
a distribution made to Debtor by QGP acknowledge and reaffirm that
the payment being made is "subject to the [Undertaking] previously
signed confirming [Debtor's] obligation to pay this and all future
distributions back to the General Partner to the extent necessary to
allow the General Partner to make good on its clawback obligation to
the limiteds."  Strauss Decl., Exhibits F, L, Z, AA, BB, CC, DD, EE,
FF and GG.  The evidence presented demonstrates that distributions
were being made to QGP's Regular Limited Partners to "facilitate
[their] payment of 1997 taxes" on their partnership interests and
because such principals had indicated they "need[ed] the money."
Strauss Decl., Exhibit F; Shields Decl., Exhibit 3.  These same
Regular Limited Partners clearly had some degree of control over
these distributions because the Regular Limited Partners not only
disagreed over the allocations proposed but, in fact, asked Mr. Alix
to distribute said funds.  Shields Dec., Exhibit 3.  Debtor was one
of four individuals who held interests as Regular Limited Partners
of QGP.  The evidence does not indicate a breach of fiduciary duty
of disclosure by QGP to such Regular Limited Partners.  To the
contrary, the Regular Limited Partners clearly received regular
disclosures about the financial status of the Fund and detailed
calculations of the potential Clawback obligation.

Under the facts presented, a reasonable trier of fact could find
that QGP's reliance on Debtor's promise, as contained in the
Undertaking, to honor the Clawback was reasonable, under a theory of

promissory estoppel, even if the Undertaking is not an enforceable

contract.   Therefore, a genuine issue of material fact exists as to

the issue of reasonable reliance.   Debtor's request for summary

judgment on QGP's claim of promissory estoppel is, therefore,

denied, subject to the potentially applicable statute of repose to

be discussed below.


D.   <u>Unjust Enrichment</u>

    Debtor's motion also seeks summary judgment as to QGP's claim of

unjust enrichment.

>    Unjust enrichment is the unjust retention of a benefit
>    to the loss of another, or the retention of money or
>    property of another against the fundamental principles of
>    justice or equity and good conscience.  In finding a party
>    is entitled to an equitable remedy for unjust enrichment,
>    courts look to several factors: (1) an enrichment, (2) an
>    impoverishment, (3) a relation between the enrichment and
>    the impoverishment, (4) the absence of justification, and
>    (5) the absence of a remedy provided by law.  Of cardinal
>    significance is whether a contract already governs the
>    parties' relationship. In short, if there is a contract
>    between the complaining party and the party alleged to have
>    been enriched unjustly, then the contract remains the
>    measure of [the] plaintiff's right.

<u>MetCap Sec. LLC v. Pearl Senior Care, Inc.</u>, 2007 WL 1498989, at *5

(Del. Ch. May 16, 2007) (footnotes, citations, and quotations

omitted).

    QGP argues that, if the Undertaking is not an enforceable

contract, unjust enrichment would apply to render Debtor liable for

Debtor's share of the Clawback to the extent Debtor received

distributions in excess of such Clawback.   Debtor received over $3.4

million, of which $2,913,748 ultimately turned out to be more than

Debtor was entitled to receive.   QGP argues Debtor was unduly

enriched and QGP was correspondingly impoverished by this

overpayment. QGP asserts there is no equitable justification to allow Debtor to retain the distributions, and, if the Undertaking is invalidated, there would be no remedy at law.

Debtor responds that QGP's claim of unjust enrichment fails because an express, enforceable contract controls the relationship between QGP and Debtor -- namely, the QGP Agreement. If, as noted above, a contract exists, then a claim of unjust enrichment will not stand. <u>Bakerman v. Sidney Frank Importing Co., Inc.</u>, 2006 WL 3927242, at *18-19 (Del. Ch. Oct. 10, 2006).[56] If the Undertaking fails -- which is the only circumstance under which QGP's claim of unjust enrichment would arise -- then the parties are left with the QGP Agreement's contractual provisions governing distributions. As stated by Debtor, "[t]here is nothing 'unjust' about [Debtor] asserting his rights under that contract."[57]

The Court finds Debtor's arguments with respect to QGP's unjust enrichment claim compelling. There are two potential contracts governing distributions by QGP to Debtor -- the QGP Agreement and the Undertaking. If the Undertaking is enforceable, then QGP's claim of unjust enrichment is inapposite. If the Undertaking is not enforceable, then the parties are necessarily left with the contractual rights outlined in the QGP Agreement. While promissory estoppel may be a remedy, a valid and enforceable contract precludes the application of the theory of unjust enrichment. Therefore,

---

[56] Claims for unjust enrichment may survive a motion to dismiss, however, when the validity of the underlying contract is uncertain. <u>Bakerman v. Sidney Frank Importing Co., Inc.</u>, 2006 WL 3927242, at *18 (Del. Ch. Oct. 10, 2006); <u>Student Fin. Corp. V. Royal Indem. Co.</u>, 2004 WL 609329, at *7 (D. Del. Mar. 23, 2004).

[57] Debtor's MPA at 21:12.

1  summary judgment in Debtor's favor is merited as to QGP's claim of

2  unjust enrichment.

3

4  E.   <u>Statute of Repose</u>

5       Debtor's final defense to QGP's non-contractual causes of action

6  is that such causes of action are barred by the applicable statute

7  of repose.[58]  Debtor cites Delaware Code section 17-607, which

8  provides as follows:

9       § 17-607. Limitations on distribution

10       (a) A limited partnership shall not make a
    distribution to a partner to the extent that at the time of
11   the distribution, after giving effect to the distribution,
    all liabilities of the limited partnership, other than
12   liabilities to partners on account of their partnership
    interests and liabilities for which the recourse of
13   creditors is limited to specified property of the limited
    partnership, exceed the fair value of the assets of the
14   limited partnership, except that the fair value of property
    that is subject to a liability for which the recourse of
15   creditors is limited shall be included in the assets of the
    limited partnership only to the extent that the fair value
16   of that property exceeds that liability. For purposes of
    this subsection (a), the term "distribution" shall not
17   include amounts constituting reasonable compensation for
    present or past services or reasonable payments made in the
18   ordinary course of business pursuant to a bona fide
    retirement plan or other benefits program.

19
        (b) A limited partner who receives a distribution in
20   violation of subsection (a) of this section, and who knew

21

22       [58]  Debtor initially argued in his papers that subsection (c)
    applied to *all* claims to recover distributions made under Delaware
23   limited partnership law, including claims pursuant to a contract.
    Debtor revised this argument when QGP responded by quoting "the
24   leading treatise on the DRULPA" for the proposition that "the
    statute of limitations provided by Section 17-607(c) does not apply
25   to return obligations contractually provided in a partnership
    agreement."  Martin I. Lubaroff & Paul M. Altman, Lubaroff & Altman on
26   Delaware Limited Partnerships § 6.10 (2006).  Debtor's final position
    was that title 6, section 17-607(c) of the Delaware Code bars QGP's
27   claims for breach of fiduciary duty, promissory estoppel and unjust
    enrichment -- but not QGP's claim for breach of contract.
28

Case: 03-54723  Doc #786  Filed: 10/14/10  Entered: 10/14/10 13:21:32  Page 37 of
42

at the time of the distribution that the distribution violated subsection (a) of this section, shall be liable to the limited partnership for the amount of the distribution. A limited partner who receives a distribution in violation of subsection (a) of this section, and who did not know at the time of the distribution that the distribution violated subsection (a) of this section, shall not be liable for the amount of the distribution. Subject to subsection (c) of this section, this subsection shall not affect any obligation or liability of a limited partner under an agreement or other applicable law for the amount of a distribution.

(c) Unless otherwise agreed, a limited partner who receives a distribution from a limited partnership shall have no liability under this chapter or other applicable law for the amount of the distribution after the expiration of 3 years from the date of the distribution.

DEL. CODE ANN. tit. 6, § 17-607.

Debtor argues that title 6, section 17-607(c) of the Delaware Code is a statute of repose, eliminating any potential liability of limited partners for distributions after three years. Here, the undisputed facts establish that Debtor received his last distribution from QGP on August 17, 2000. Strauss Dec., Exhibit GG. Debtor filed his Chapter 11 bankruptcy petition on July 31, 2003. QGP asserted an informal proof of claim on October 2, 2003 and, thereafter, filed an "amended" formal proof of claim on November 21, 2005. Debtor notes that the assertion of QGP's claim, even informally, occurred more than three years after the final distribution was made to Debtor -- specifically, three years, one month and fifteen days after such final distribution. Therefore, argues Debtor, even if Debtor had an obligation to return the funds sufficient to satisfy the Clawback, such an obligation expired prior to the assertion of QGP's Claim.

QGP's response to this statute of repose argument is that the parties "otherwise agreed" -- as allowed by section 17-607(c) of the

Delaware Code -- through the Undertaking. This, argues QGP, takes
QGP's claim outside the scope of section 17-607. Through the
Undertaking, all of the principals agreed

> to restore to the General Partner and to Questor
> Principals, Inc. any distributions heretofore or hereafter
> made to the undersigned out of the distributions made to
> the General Partner pursuant to the GP Carry Distributions
> Sections to the extent necessary to furnish the
> undersigned's pro rata share of the amount necessary [for
> the Clawback]. . . .

Such agreement, argues QGP, is an acceptance of "liability . . . for
the amount of the distribution after the expiration of 3 years from
the date of the distribution." DEL. CODE ANN. tit. 6, § 17-607(c).

Debtor, in turn, responds that the Undertaking does not mention
section 17-607 or any three-year statute of repose. Without such an
express acknowledgment, argues Debtor, the parties did not
"otherwise agree" to waive the provisions of section 17-607(c) of
the Delaware Code. Scharf v. Edgcomb Corp., 2004 WL 718923, at *15
(Del. Ch. Mar. 24, 2004) ("[A]s a general matter, a waiver of the
statute of limitations must be express because of the strong policy
considerations underlying the enactment of statutes of
limitations."), rev'd on other grounds, 864 A.2d 909 (Del. 2004).

QGP responds that even if the Undertaking is not viewed as an
express agreement to waive the provisions of section 17-607(c), the
Undertaking was an implied agreement to accept liability for the
return of distributions over three years after such distributions,
since its express purpose was to assure payment of a Clawback that
is an accounting that is made at the end of the life of the Fund.
As even noted in *Scharf*:

> These [strong policy considerations] have led commentators
> to generalize that "[t]he promise of the defendant not to
> raise the defense of the expiration of the limitations

Case: 03-54723    Doc# 786    Filed: 10/14/10    Entered: 10/14/10 13:21:32    Page 39 of
42

UNITED STATES BANKRUPTCY COURT

1  period must either be express or couched in words clearly
   conveying the defendant's intention not to plead the
2  statutory bar."

3  <u>Scharf</u>, 2004 WL 718923 at *15 (quoting <u>United States v. Richardson</u>,

4  889 F.2d 37, 40 (3d Cir. 1989)).

5      The central question, therefore, is whether Debtor clearly

6  conveyed Debtor's intent to remain liable for the Clawback through

7  Debtor's execution of the Undertaking.  Any ambiguities on this

8  issue must be resolved against QGP as the drafter of the

9  Undertaking.  <u>Holiday Homes of St. John, Inc. v. Lockhart</u>, 678 F.2d

10 1176, 1184 (3d Cir. 1982) ("ambiguities in a contract should be

11 resolved against the party who drafted it"); RESTATEMENT (SECOND) OF

12 CONTRACTS § 206 (1981).

13     The Court finds that the Undertaking is not ambiguous on this

14 matter.  Through the Undertaking, Debtor agreed to be "irrevocably"

15 "legally bound" to restore any distributions made "to the extent

16 necessary to furnish the undersigned's pro rata share" of the

17 Clawback obligation defined in Section 10.3 of the QGP Agreement.

18 This was not an indefinite period, as was the issue in *Richardson*.

19 The Clawback, by definition, would be determined at the end of the

20 lifetime of the Fund.  Although there is no date specified for

21 determination of the Clawback, the lifetime of the Fund was still a

22 finite period.

23

24

25

26

27

28

III.

CONCLUSION

For the above-stated reasons, the Court finds:

(1)     Partial summary judgment in QGP's favor is merited as to QGP's fiduciary duty cause of action in the amount of $2,913,748;

(2)     Partial summary judgment in QGP's favor is merited as to QGP's breach of contract cause of action in the amount of $2,815,929.99, the total amount of the distributions made by QGP to Debtor after his execution of the Undertaking;

(3)     Partial summary judgment cannot be entered in Debtor's favor with respect to QGP's promissory estoppel cause of action because a genuine issue of material fact exists with respect to QGP's reasonable reliance on Debtor's promise to repay the Clawback;

(4)     Partial summary judgment in Debtor's favor is merited as to QGP's unjust enrichment cause of action; and

(5)     Partial summary judgment in QGP's favor is merited as to the inapplicability of Delaware Code section 17-607 on Debtor's promise to repay the Clawback.

Counsel for QGP shall prepare a proposed form of order consistent with the Memorandum Decision, which should be circulated to Debtor's counsel for review and approval as to form and content prior to submission to the Court.


                    *** END OF MEMORANDUM DECISION ***

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1  <u>Court Service List</u>

2  Edward L. Scarff
   631 Morningside Rd.
3  Los Altos, CA 94022

4  Edward L. Scarff
   542 Pentoga Trail
5  Crystal Falls, MI 49920

6  Gayle Green, Esq.
   Binder & Malter LLP
7  2775 Park Avenue
   Santa Clara, CA 95050
8
   Jeffrey S. Facter, Esq.
9  Shearman & Sterling LLP
   525 Market Street, Suite 1500
10 San Francisco, CA 94105-2723

11 Sean T. Strauss, Esq.
   Shearman & Sterling LLP
12 525 Market Street, Suite 1500
   San Francisco, CA 94105-2723
13
   Harry Hochman, Esq.
14 Pachulski Stang Ziehl & Jones LLP
   10100 Santa Monica Blvd., 11th Floor
15 Los Angeles, CA  90067-4100

16 Joshua M. Fried, Esq.
   Pachulski Stang Ziehl & Jones LLP
17 150 California Street, 15th Floor
   San Francisco, CA 94111-4500
18
   Sheldon S. Toll, Esq.
19 Law Office of Sheldon S. Toll
   2000 Town Center
20 Suite 2550
   Southfield, MI 48075
21
   Sheldon S. Toll, Esq.
22 Law Office of Sheldon S. Toll
   2000 Town Center
23 Suite 2100
   Southfield, MI 48075
24
   Office of the U.S. Trustee
25 280 S. 1st St. #268
   San Jose, CA 95113-3004
26

27

28

MEMORANDUM DECISION ON CROSS-MOTIONS                    Case No. 03-54723 ASW
FOR SUMMARY JUDGMENT                                         42